**CASSELBERRY et al v. FLETCHER et al.**

SWAMP AND OVERFLOWED LANDS.—C. resided on the lands and had done so more than twenty-five years; he took a contract to levee the lands and performed the work. H. went to the Swamp Land Office and entered the lands; two days after this, C. entered the same lands, as part pay for the levee he had contracted to construct across the lands; a contest was had before the land agent, a patent issued to H. and none to C. *Held*, on bill by C. to enjoin suit in ejectment by H.: That under *Section* 13, *of the Act of January* 6, and *Section* 4, *Act of January* 11, 1851, the equitable title of C. was superior to the prior legal title of H. and a perpetual injunction would be awarded.

APPEAL FROM MISSISSIPPI CIRCUIT COURT.

Hon. JOHN E. BENNETT, *Circuit Judge.*

*Adams, Dixon & Pike,* for Appellants.

The land in controversy in this suit was, and is admitted to be included in the Act of Congress, 28th September 1850. Other provisions of the Act provide for the location, report

and confirmation of said lands, and patents therefor to the State, and especially by Section 2 of said Act of Congress it is provided, "and on that patent the fee simple to said lands shall vest in the State of Arkansas, subject to disposal of the Legislature thereof: *Provided*, however, that the proceeds of said lands, whether from sale or *direct appropriation in kind*, shall be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid."

By Section 4, of the Act of the General Assembly of the State of Arkansas, passed and approved on the 6th of January, 1851, it is provided, "That the payment for making said levees and drains shall be made *in the lands reclaimed*, or in the proceeds of the sales thereof, at the price previously fixed upon said lands by the commissioners," and by the thirteenth section of the same Act, it is, among other things, provided, "that all persons * * * * *who shall reside on*, or who shall have improved the same (that is any of said lands so granted), *shall have the exclusive right of purchase thereof*, to the extent of their claims, *for the period of twelve months from and after the date* of the patents issued by the United States to this State, at the price previously fixed upon the same, not to exceed one dollar and twenty-five cents per acre;" and by Section 4 of the Act of said General Assembly, of date the 11th day of January, 1851, it is also provided:

"That any person owing lands on the *banks* of any river, in any swamp and overflowed land district, shall have the preference of taking the contract to levy such lands; *Provided*, he takes the contract at the lowest bid, and such person so contracting, shall have the preference to take in pay for executing his contract any lands, swamp or overflowed, *lying in the rear or adjacent to his own lands*."

These are the provisions of the statutory law applicable to this cause, and upon which, under the facts and the general principles of equity, it must be determined.

It is perfectly manifest that the whole scope and purpose of

all these legal provisions are, and were, to secure the reclamation of the swamp and overflowed lands of the State, to protect and save to the citizens their estate, and *homes*, and the benefits arising from the proposed work, and thereby to enlist them in the more hearty and efficient prosecution of the labor of erecting the levees.

In the first place, the lands were to be reclaimed. Next, the compensation for the necessary labor should be made with the lands themselves. Next, those *actually residing and having their homes upon the lands*, should have the exclusive right to purchase the same for the space of twelve months after the *date* of the *patents* from the United States to this State therefor. And lastly, that lands adjacent to private lands should be saved to their owner, if he should take the work at the lowest bid.

The court will take judicial cognizance of the fact that the lands in controversy in this suit were not patented by the United States to this State prior to the 27th day of September, 1858; such patents for the lands in the township and range in which these lands lie bearing dates respectively the 27th day of September and the 10th day of November, 1858.

We therefore, and we think justly, contend that complainants are entitled to the relief asked, and the provisions of both the thirteenth section of the Act of the 6th January, 1851, and of fourth section of the Act of 11th January, 1851, the proof, under both, as we think, being ample and conclusive.

*John C. Palmer*, for Appellees.

The first point upon which appellees rely is, that the rights of the parties having been settled by the swamp land agent, his decision cannot be attacked except upon an allegation, sustained by proof of fraud. By section 41, chapter 101 of the Digest, the swamp land agents were vested with full

authority and jurisdiction to settle and adjudicate contested pre-emptions, and no authority is given to any tribunal to revise their decisions. The authority of a Court of Chancery to interfere in cases of this sort, is confined to clear equity jurisdiction.

The bill in this case charges fraud. The injunction was granted on this allegation, and complainants are entitled to no relief unless fraud is proved—the answer especially denying fraud. *Borden et al vs. State,* 11 *Ark.,* 547; *Wynn vs. Morris et als.* 16 *Ark.,* 414; *Lytle et als. vs. the State,* 17 *Ark.,* 608; *McIver vs. Williams,* 24 *Ark..* 33; *Paty vs. Harrell,* 24 *Ark.,* 40; *Schaer vs. Gliston,* 24 *Ark.,* 137; *Branch vs. Mitchell,* 24 *Ark.,* 149.

It is well settled that when the matter adjudicated is by a court of peculiar and exclusive jurisdiction, and where no appeal is allowed, or revising power given by law, such adjudication is final and conclusive upon all other courts and persons, until · *successfully impeached upon the charge of fraud.* *Lessee of Rhode vs. Selin,* 4 *Wash. C. C. Rep.,* 721; *Voorhees vs. U. S. Bank,* 10 *Pet.,* 478; *United States vs. Arredondo,* 6 *Pet.,* 729; *Wilcox vs. Jackson,* 13 *Pet.,* 511; *Borden et al. vs. State,* 11 *Ark.,* 547; *Foley vs. Harrison,* 11 *Howard U. S. R.,* 448; *McGee vs. Wright,* 16 *Ill.,* 557.

GREGG, J.—On the 5th of May, 1868, the appellants filed their bill in equity, in the Mississippi Circuit Court, in which they allege that, in 1838, one Howe proved up a pre-emption to the southwest quarter of section 3, in township 15, north of range 13 east, under the act of Congress of 1833, and that the same, in 1843, by transfer and assignment, came into the hands of Isaac S. Casselberry, the father of complainants; that the same was never offered for sale by the United States government, and in 1850 it was granted to the State of Arkansas as swamp and overflowed lands; that said Isaac S. and family have, ever since, had actual and continuous possession of said lands, and that under the act of the Legislature

of 1851, they, or the said Isaac S., had a preference right to purchase said land, and pay for the same in levee work, and that he took, and caused to be completed, a levee contract on said lands; that said Isaac S. died in 1852; that in June, 1852, said complainant, as administrator, proved up a pre-emption right, in the proper swamp land office, and on the 28th of March, 1853, purchased said lands and paid in levee work then done, and procured a certificate. That Elliott Hickman, the father of the appellees, well knowing the rights of the complainants, in collusion with or fraud upon the land officers, and in fraud of the rights of the complainants, entered said lands, and procured a deed therefor; and that he, at the November term, 1868, of the Circuit Court of that county, brought an action of ejectment against the complainants. They prayed for an injunction perpetually restraining all proceedings in ejectment; that the heirs of Elliott Hickman be divested of title, and that title be vested in complainants, as the widow and heirs of said Isaac S. Casselberry, and for general relief. Sarah Hickman, Francis Fletcher and Juda Murphy answered and denied that Howe ever proved up a pre-emption right, or that any was transferred, but averred that a pre-emption right was proved up by one Baker, and afterwards, in 1839, assigned to Elliott Hickman. They admit the possession of Casselberry, and that the lands were granted to the State as alleged, the representative character of the complainants, and the death of the said Isaac S., but deny that the complainant, Martin Casselberry, as such administrator, ever proved up a pre-emption under State laws.

They aver that they do not know of his levy contract, and ask that he be held to proof, etc. They aver that Elliott Hickman proved up a pre-emption under State laws, and entered the land long before Casselberry, and that upon a full and fair trial before the State Swamp Land Agent, at Helena, a certificate of entry was granted to him and refused to said Casselberry, and that a deed therefor was duly granted to him by the Governor of the State.

Depositions were taken and certificates procured by the appellants to show the performance of the levee contract, and the application to purchase the lands in such work, and that the lands were taken in part payment for such levee work within a few days after Hickman's purchase. The appellees took no depositions.

The record entry, preceding the decree, states, "That it is agreed that Elliott Hickman's entry is the oldest by at least two days, and that all questions as to pre-emption, either by authority of the United States or the State of Arkansas, are withdrawn and not to be considered, except as to the claims of the complainants under section 4 of the act of January 11, 1851, and the exclusive right of purchase secured by section 13 of the act of the 6th of January, 1851, to persons other than those claiming benefits of pre-emption under acts of Congress."

By the admissions of the parties, in the pleadings, by the evidence and admissions stated upon the record, the case may be stated thus: Casselberry resided on the lands, and had done so more than twenty-five years; he, through his son, Martin, took a contract to levee the lands, and performed the work.

Elliott Hickman went to the swamp land office and entered the land; two days after this Casselberry went and entered the same lands as part pay for the levee he had contracted to construct across the land; a contest was had before the land agent; a patent issued to Hickman and none to Casselberry.

Complainants claim that their rights under *section* 13 of the act of *January* 6, and *section* 4, act of *January* 11, 1851, are superior to those of appellees.

Appellees claim that said acts conferred no rights or privileges upon Casselberry over other citizens, and that Hickman complied with all the necessary requirements of the swamp land laws, and obtained the patent, and that his entry was prior in time and should prevail.

It is insisted by the appellees that the appellants acquired

no preference under the *4th section* of the act of the *11th of* *January*, 1851, because there was no sufficient title in them, or their ancestor, in the front lands upon the bank of the river ; that the levee was made upon the lands in controversy, and not on adjacent lands in front as required by the statute, etc.

It is very clear that the general policy of the land laws, both national and State, has been and is to favor the actual settler; to prefer those who, with their families, push forward to clear up the forests. Such being the general policy of the government, a court of equity, where the language of the statute will justify, should so construe it as to carry out that public policy.

These lands being granted to the State, the object was to reclaim them by the necessary levees and drains, and in addition to the favor due the occupant, it may well have been supposed that the actual settlers' personal interest would secure more faithful work than would likely be had at the hands of one whose pay was his only interest, as to results. With such objects in view, we can see no reasonable intent to exclude one, the title to whose possession might be acquired and the lands protected by such work; and we think it not unreasonable to hold that the man who owned the possessory right and had the occupancy and control of the lands to be reclaimed, was within the intent and meaning of the act referred to, and an equitable and liberal construction of the act in favor of those evidently intended to be benefitted by it, embraces the lands occupied, as well those more remote from the levee; and Martin Casselberry being the administrator and an heir of Isaac S., certainly had a right to complete the purchase in behalf of the representatives of the said Isaac deceased.

By *section* 13 of the act of *January* 6, 1851, it is provided "that all persons   *   *   *   *   who shall reside on or who shall have improved such lands, shall have the exclusive right to purchase thereof, to the extent of their claims, for a period

of twelve months from and after the date of the patents issued by the United States, at the price fixed upon the same," etc.

It is insisted, however, that this section was modified and limited by the act of the 12th of January, 1853. That is true, but under the latter act the settler had the same right of pre-emption, only he was liable to lose the same if he did not make his entry or prove up his pre-emption before the day fixed by the land agent for the public sale of the lands.

In this case, many years of continuous and uninterrupted possession of the lands, is alleged in the complainants and admitted by the defendants; showing clearly a right of pre-emption in Casselberry, and that right certainly entitled him to this preference, if not forfeited by his act or negligence.

This occupation and all facts necessary to vest in Casselberry a right of pre-emption, being admitted in the pleadings or shown in evidence, those disputing that right should have shown wherein it had lapsed or been forfeited.

In the case of *Hempstead v. Underhill's Heirs*, 20 *Ark.*, 351, the court said, "Section 10 of this act" (the act of the 12th of January, 1853) "declares that every head of a family who may hereafter settle upon *or who is now a settler upon any of the undisposed of swamp lands and overflowed lands, shall have a pre-emption right thereto, in exclusion of all persons whatsoever up to the day of such sale,* and shall have a right to enter any of the legal subdivisions as above recited, * * * * * but if such settler fail to make such entry before the day set apart for such sale then the right of entry shall be lost, and the lands offered for sale to the highest bidder," etc.

In a subsequent paragraph of the same case, this court said: "Moreover, neither *the petition* nor the *mandamus* nor the *response* states *the time at which the appellant received the maps and plats* at his office, or the day upon which *he made his first public sale,* under the act of the 12th of January, 1853, consequently we have nothing before us from which we can determine with any legal certainty, nor had the court

below, *that the entries of Fitzgerald and Norwood were not made before the day of sale,* and within the period limited by the statute in question."

In the case now before us, without referring to the confirmatory historic fact of sale, the record presents neither averment or proof, tending to show that these lands had been offered for sale before the entry made by Casselberry, and as the admissions and testimony show satisfactorily his occupancy of the lands, his agreement and completion of the levee contract, and his entry of the land in payment for the work done under such contract, it seems to create in his favor equities, not to be defeated by a legal title, that can only claim priority in time.

In the case of *Branch vs. Mitchell,* 24 *Ark.,* 447, this court said : " Under the act of the 11th of January, 1851, Mitchell had the right, in preference to all others, to take the contract in question, for levying in front of these lands   *      *      * but according to the argument he must go on and complete the levees before he could select any of the rear lands, and in the meantime, Jordan, or any other person might purchase these lands, as swamp lands, from the State, or buy them of the United States, and so defeat his pre-emption right altogether; that would make the right truly a visionary and unsubstantial thing. Either he could make the selection at any time, as the work progressed, and so prevent any sale of the same lands to others, or *he could require the commissioners not to sell any of the rear lands which he might have a right to take in preferment to other persons."*

Further, they say, " No matter at what date he selected the lands, if he finished the work in whole or in part, and the commissioners approved of and received it, and the amount due for it were enough to pay for the lands, they became his, and his title, if necessary, as against any intervening purchaser or claimant, would relate to the 11th of January, 1851, on which day the right of preference, in building the levee and taking these lands in payment, vested. And it is quite

clear *that having the right of pre-emption of the land, and having taken the contract to build the levee, and commenced the work, he could not be ousted of his right of pre-emption by a purchase made by any other person even from the State, though he did not select the lands until after such purchase.*"

If these rulings be correct, upon the whole record before us, the complainants ought to have recovered.

In our opinion Casselberry had a preference right in the levee contract. The work was done and accepted for the land, and that gave a paramount title, and the swamp land department should have so decided.

All are presumed to know the law. Hickman, knowing of Casselberry's possession and claim of title, must therefore have known he had a preference right, and knowing of this right, it was a fraud on his part to attempt to enter these lands from under the occupants, who were then completing payment for them, and courts of equity will not encourage such practices.

We hold that the equitable title of the appellants is superior to the prior legal title of the appellees, and a decree according to the prayer of the bill will be rendered in this court.

BENNETT, J., did not sit in this case.

HON. J. R. HARRINGTON, *Special Judge.*