KIRBY et al. v. LEWIS et al.

*(Circuit Court, E. D. Arkansas. June 4, 1889.)*

1. PUBLIC LANDS—TITLE FROM STATE—RECITAL IN PATENT.
   Recitals in the patents of the state are deemed to be made upon suggestion of the grantee.
2. SAME—DEEDS—RECITALS—PAROL EVIDENCE.
   The recitals in a deed constitute a part of the title. The acceptance of a deed by a grantee makes its recitals evidence against him, and parol evidence is inadmissible to contradict or vary them.
3. SAME — SWAMP LANDS — GRANT TO STATE — SUBSEQUENT SALE BY UNITED STATES.
   The grant of the swamp lands to the state by the act of congress of September 28, 1850, passed the title from its date, and after that time the United States could not make a sale of such lands that would divest the rights of the state under that act. But where the United States sold such lands subsequent to the grant, it was competent for the state to confirm the title of the purchaser from the United States; and that was done by the acts approved January 11, 1851, and December 14, 1875. By these acts the state's title to all swamp lands sold by the United States after the 28th of September, 1850, is vested in the purchasers of such lands from the United States, except in cases where such lands had been sold by the state, or persons had acquired a pre-emption or other vested right to them under the laws of the state prior to their sale by the United States.
4. SAME.
   It has been the constant and uniform policy of the state of Arkansas and the United States to avoid confusion and conflict in the title to swamp lands growing out of the delay in their selection and confirmation, and their sale in the mean time by the United States. This policy has been carried out by the state confirming the titles of the purchasers of such lands from the United States, and accepting in lieu thereof the purchase money received therefor by the United States, which the latter, by the acts of congress approved March 2, 1855, and March 3, 1857, agrees to pay over to the state.
5. SAME—APPLICATION TO PURCHASE.
   By law, one applying to the commissioner of state lands to purchase swamp lands, under the act of March 18, 1879, is required to prove by affidavit, before the commissioner, and to be filed in his office, the existence of certain facts. *Held*, following *Rice v. Harrell*, 24 Ark. 402, that the proof of these facts in the mode prescribed by law is a condition precedent to the right of the applicant to purchase, and to the authority of the commissioner to sell, lands, under that act.

**6. SAME—QUITCLAIM DEED—BURDEN OF PROOF.**
Where the state makes a quitclaim deed to land alleged to be swamp land, but which has never been selected, certified, or designated as such by any officer or agent of the state or the United States, the burden of the proof is on the grantee in such deed to show by clear and satisfactory proof that the land was swamp land on the 28th of September, 1850. Unsatisfactory character of the proof in this case commented on.

**7. SAME—EVIDENCE—FIELD NOTES.**
The field-notes of the survey of the public lands are competent evidence, and have the force of a deposition.

**8. SAME—SELECTION BY AGENT.**
By an act approved January 6, 1851, the state elected to select the swamp lands to which she was entitled under the act of September 28, 1850, and for that purpose appointed an agent in each county, whose duty it was to select and report all swamp lands in the county. The agent for the county in which the land in controversy lay selected and reported the swamp lands in that county in 1860, or earlier; and it is not shown that the state has selected or made any claim to any other lands in that county under the swamp-land grant, since that time. It is a maxim of the law that a public officer is presumed to have fulfilled every requisite which the discharge of his duty demands, and this maxim is applicable to the state agent, and it will be presumed that he selected and reported all the swamp lands in the county in accordance with his official duty; and, after the lapse of 30 years, and on the facts of this case, this presumption would seem to be conclusive.

**9. SAME—EVIDENCE—OFFICIAL REPORTS.**
The official reports and correspondence of public officers of the state and the United States, relating to the swamp lands of the state, and published by authority of the legislature, are public documents which the court has a right to consult, even if not made formal proof in the case.

At Law.
*F. W. Compton,* for plaintiffs.
*Dodge & Johnson* and *Scott & Jones,* for defendants.

CALDWELL, J. This is an action of ejectment. It was originally brought against numerous defendants to recover 201.52 acres of land, comprising a considerable portion of the city of Texarkana and its suburbs. The action has been dismissed as to all the lands except a part of the S. ½ of the S. W. fractional ¼ of section 30, township 15 S., range 28 W., and as to all the defendants except John V. Lewis, William P. Anderson, Frank H. Baldwin, and Walter H. Field, who claim title to the parcel of the S. ½ of the S. W. fractional ¼ described in the amended complaint. The case can best be understood by stating the defendants' title first. The S. W. fractional ¼ of section 30, township 15 S., range 28 W., containing 81.52 acres, was entered by the Cairo & Fulton Railroad Company at the United States land-office at Washington, Ark., December 6, 1856, and was patented to the railroad company July 1, 1859. In the certificate of entry and first patent there was a mistake in the description of the land purchased, in this: it was described as the W. ½ of the S. W. fractional ¼, which only included a small fraction on the state line of less than two acres, whereas the United States sold and the railroad company purchased and paid for, as shown by the plats, the S. W. fractional ¼, containing 81.52 acres. This error was subsequently corrected, and a patent issued for the S. W. fractional ¼, May 1, 1884, which, by operation of law, as well as by its terms, relates back to the original entry.

The defendants are the successors and grantees of the Cairo & Fulton. Railroad Company, and own all the right and title to the land that passed under the patent of the United States to that company. The practice act of this state requires the plaintiff in an action of ejectment "to set forth in his complaint all deeds and other written evidences of title on which he relies for the maintenance of his suit," and to file copies of the same. In their complaint the plaintiffs rely for the maintenance of their suit on a deed for the land in controversy, executed to them by the commissioner of state lands, which reads as follows:

"QUITCLAIM DEED TO UNAPPROVED SWAMP LANDS.— ACT MARCH 18TH, 1879.

"*The State of Arkansas, to All to Whom These Presents shall Come, Greeting:* Know ye, that Joseph F. and John C. Kirby have this day purchased from the state of Arkansas the north half of the south-east quarter, and the south-west quarter of the south-east quarter, and the south-west fractional quarter of section thirty, (30,) in township fifteen (15) south of the base line in range twenty-eight (28) west of the fifth principal meridian, containing two hundred and one and 52-100 acres, (201 52-100;) the same being a portion of the swamp and overflowed lands selected by the state of Arkansas as inuring to the said state under the provisions of an act of the congress of the United States of America, entitled 'An act to enable the state of Arkansas and other states to reclaim the "swamp lands" within their limits,' approved 28th of September, 1850, and which still remains unapproved and unpatented to the state of Arkansas by the general government. Now, therefore, I, W. P. Campbell, commissioner of state lands in and for the state of Arkansas, in pursuance of the provisions of an act of the general assembly entitled 'An act to authorize the sale of swamp lands in certain cases,' approved 18th March, 1879, and for the consideration of two hundred and one dollars and fifty-two cents, ($201.52,) this day paid to the treasurer of the state of Arkansas, being the amount.in full for the purchase money for said land, the receipt for the same being now on file in my office, do hereby, for and in behalf of the state of Arkansas, grant, bargain. sell, and convey to the said Joseph F. and John C. Kirby, and to their heirs and assigns forever, all the right, title, interest, and claim the estate of Arkansas has in and to the above-described land, together with all the appurtenances and hereditaments thereunto belonging, to have and to hold the same as now held by the said state, unto the said Joseph F. and John C. Kirby, and to their heirs and assigns forever: provided, however, that if the land above described and conveyed is of a character not comprehended in the act of congress granting the swamp and overflowed lands to the state of Arkansas, then and in that case the said Joseph F. and John C. Kirby shall have no claim or demand on the state of Arkansas for recoupment or otherwise.

"In testimony whereof, I, W. P. Campbell, commissioner of state lands for the state of Arkansas, have hereunto set my hand, and caused the seal of this office to be affixed at the city of Little Rock, on this 25th day of September, 1883. [Seal.]            W. P. CAMPBELL, Commissioner of State Lands."

It will be observed that the deed from the commissioner of state lands to the plaintiffs recites that the lands described therein are "a portion of the swamp and overflowed lands selected by the state" under the swamp-land grant "which still remains unapproved and unpatented to the state," and that the deed is made "in pursuance of the provisions" of the act approved March 18, 1879. That act reads as follows:

"**Section 1.** That all lands which have been and which may hereafter be selected by any authorized agent of the state to make selections of swamp and overflowed lands be, and the same shall hereafter be, subject to sale on the following conditions, whether the same has ever been approved and patented to the state by the general government or not:

"Sec. 2. That pre-emptors and settlers on the selected and unconfirmed swamp lands of the state, and their legal representatives or assigns, shall have a preference right to purchase such lands by making satisfactory proof to the commissioner of state lands of their rights as such pre-emptors and settlers.

"Sec. 3. That any person not a pre-emptor or settler, who shall apply to purchase any of such lands, shall make and file with the commissioner of state lands an affidavit stating that the land applied for has no improvement on it, and that no person is residing upon it, or claims it by virtue of any pre-emption certificate issued by authority of law, to the best of his or her knowledge and belief, which affidavit shall be attested by the county or circuit clerk, or by some notary public of the state, or by the commissioner of state lands, and shall be filed in the state land-office.

"Sec. 4. That on proper application being filed with the commissioner of state lands for the purchase of any of the selected and unconfirmed swamp lands of the state, and full payment therefor being made to him, he shall execute to the purchaser or purchasers thereof a quitclaim deed therefor conveying all the right, title, and interest of the state in and to the land so sold."

It will be observed that the power of the commissioner of state lands to sell under this act is limited to "lands which have been and which may hereafter be selected by any authorized agent of the state to make selections of swamp and overflowed lands;" and it is recited in the deed that the land in controversy had been so selected. On the 14th of December, 1875, the general assembly of the state passed an act, the preamble of which reads as follows:

"Whereas, under the provisions of the act of congress approved September 28, 1850, entitled ' An act to enable the state of Arkansas and other states to reclaim the swamp lands within their limits,' a large amount of lands were selected which were afterwards disposed of by the United States; and whereas, upon proper proof that any lands so selected came within the provisions of the grant aforesaid, the United States government will refund to the state, in case of cash entry, the amount of purchase money, and an equivalent in lands for the tracts located with military, county warrants, or script; therefore," etc.

This act provides for the appointment of "an agent whose duty it shall be to procure the necessary proof in each and every case of the kind above recited, and make a final settlement with the United States government on behalf of the state." The seventh section of this act confirms the titles of the purchasers to all swamp lands purchased from the United States after the passage of the swamp-land grant, in these words:

"Sec. 7. That all titles to lands embraced in this act are hereby ratified and confirmed, and made as valid as if deeded or patented by the state of Arkansas."

If the land in controversy was swamp land, the title to which vested in the state under the swamp-land grant, the state, by this act, relinquished and transferred her title thereto to the railroad company, who purchased it from the United States. The plaintiffs, perceiving this to

be the effect of the act, if the land was "selected" swamp land, now say that the recitals in their deed that the land is "a portion of the swamp and overflowed land selected by the state," and that the deed is made "in pursuance of the provisions of" the act approved March 18, 1879, are mistakes, and ask the court to reject them in the consideration of the case. But the plaintiffs cannot reject the recitals in their deed. In their complaint they rest their right to recover on this deed, which is made a part of the complaint. There is no suggestion in the complaint that the recitals in the deed are false, or that the plaintiffs claim title to the land on any other or different grounds than those recited in their deed. The recitals conform to the plaintiffs' application to purchase. The recitals in the grants or patents of the state "are deemed to be made upon suggestion of the grantee." *Carver* v. *Jackson*, 4 Pet. 87. The recital constitutes a part of the title. It is as much a muniment of title as any covenant therein running with the land. *Penrose* v. *Griffith*, 4 Bin. 231. The acceptance of a deed by a grantee makes its recitals evidence against him, (*Improvement Co.* v. *McCreary*, 58 Pa. St. 304,) and parol evidence is inadmissible to contradict or vary material recitals. Whenever the recitals of a patent nullify its granting clause, the grant fails. *Smelting Co.* v. *Kemp*, 104 U. S. 644. By the law of this state the recitals in the deeds made by the commissioner of state lands are to be taken as *prima facie* true. *Chrisman* v. *Jones*, 31 Ark. 609; *Hendry* v. *Willis*, 33 Ark. 833. The plaintiffs are bound by the recitals in their deed, and these recitals, under the proof, and the act of 1875, are fatal to the plaintiffs' case. The provisions of an earlier act are equally fatal to the plaintiffs' title. By the fifth section of an act approved 11th of January, 1851, it was enacted—

"That the board of swamp-land commissioners are hereby empowered to demand of and receive from the proper accounting officers of the United States indemnity at the rate of one dollar and twenty-five cents per acre for any swamp and overflowed lands within this state which have been disposed of or sold by the United States since the 28th of September, 1850, or which hereafter may be sold or disposed of by the United States."

It will be seen this act is not limited in its operation to "selected" swamp lands. In construing this act the supreme court of the state, in *Branch* v. *Mitchell*, 24 Ark. 446, say:

"The provisions of the fifth section of the act of the 11th of January, 1851, must be construed to be a consent on the part of the state to receive from the United States the purchase money paid to the latter for all such of the swamp lands as the state could rightfully relinquish, and not for any which any person might obtain a right to, as against the state, before the purchase of the same by another from the United States."

At the time the railroad company purchased the land from the United States the plaintiffs had made no settlement or improvement upon it, and had acquired no pre-emption right to it under the laws of the state, and, under the acts of the legislature cited, could not do so after its sale by the United States; and it does not appear that they ever made any effort to do so. One of the plaintiffs testifies that in 1873 he purchased

the Garrett improvement on four forties, and that seven or eight acres of the improved land was on the forty-acre tract in controversy, and that he remained in possession of the improvements from the fall of 1873 to the spring of 1874, when he was ousted of the possession of three of the forties by suit, and that he thereupon abandoned his improvement, and whatever possession he had on the tract in controversy in this case, though no suit had been brought against him for this tract. From the spring of 1874 down to the present time the railroad company and its grantees have had actual, exclusive, notorious, and adverse possession of the land, and during that time, and long before the plaintiffs obtained their deed from the commissioner of state lands, had placed improvements on the land, valued at $150,000. The grant of the swamp lands to the state by the act of congress of September 28, 1850, passed the title from its date; and after that time the United States could not make a sale of such lands that would divest the rights of the state under that act. But where the United States sold such lands subsequent to the grant, it was competent for the state to confirm the title of the purchaser from the United States, and that was done by the acts approved January 11, 1851, and December 14, 1875. By these acts the state's title to all swamp lands sold by the United States after the 28th of September, 1850, is vested in the purchasers of such lands from the United States, except in cases where such lands had been sold by the state, or persons had acquired a pre-emption or other vested rights to them under the laws of the state prior to their sale by the United States. It has been the constant and uniform policy of the state, and the United States, to avoid confusion and conflict in the title to swamp lands, growing out of the delay in their selection and confirmation, and their sale, in the mean time, by the United States. It was in pursuance of this policy that the acts of the legislature of 1851 and 1875 were passed. The clearly-defined policy of the state has been from the beginning not to contest the title of those who purchased lands from the United States to which the state claimed title under the swamp-land grant, but to confirm the title of such purchasers, and look to the United States for indemnity. This policy finds expression in numerous acts besides those that have been cited. See Acts 1885, p. 71; Acts 1887, p. 102; Acts 1889, pp. 67, 164. The legislation by congress on this subject is in harmony with that of this state. An act of congress on March 2, 1855, provides that patents shall issue to purchasers "of the public lands claimed as swamp lands," and "that upon due proof by the authorized agent of the state or states, before the commissioner of the general land-office, that any of the lands purchased were swamp lands the purchase money shall be paid over to said state or states." And by the act approved March 3, 1857, it is declared that the act of 1855 "shall be, and is hereby, continued in force, and extended to all entries and locations of lands claimed as swamp lands made since its passage."

The plaintiffs' deed is invalid for other reasons. It is quite immaterial what act of the legislature the commissioner of state lands had in view when he made the deed. On the undisputed facts in the case, he

had no authority to make it under any act. The powers of the commissioner to sell swamp lands are regulated and defined by law. He cannot sell the lands of the state at his pleasure. He is but the servant of the law, and, if he departs from its requirements, his acts are nullities. His power to sell under the act approved December 14, 1875, was limited by the words of the act to persons "who shall heretofore have taken or filed, under existing laws, a pre-emption to or upon any of the swamp lands of this state, or who shall have settled upon, improved, or cultivated said swamp lands." Under this act no one but a settler or pre-emptor on the land could purchase. The plaintiffs were neither. For more than nine years next before the commissioner made the deed to the plaintiffs, the defendants, and those under whom they claim, had been in the actual and exclusive possession of the land, making extensive and valuable improvements upon it. The actual occupancy of the land by the defendants was a bar to the plaintiffs making any settlement on the land that would give them a pre-emption right. "A settlement cannot be made upon public lands already occupied. As against existing occupants the settlement of another is insufficient to establish a pre-emption right." *Quinby* v. *Conlan*, 104 U. S. 423. The settlement or improvement which entitles one to the preference right of entry must be an actual *bona fide* settlement, and the improvement must be an existing and substantial one, which has not been abandoned. *McIvor* v. *Williams*, 24 Ark. 33; *Casselberry* v. *Fletcher*, 27 Ark. 385; *Bohall* v. *Dilla*, 114 U. S. 47, 5 Sup. Ct. Rep. 782. The commissioner cannot sell under the act of March 18, 1879, unless the land is a parcel of "the selected and unconfirmed swamp lands of the state," and the purchaser proves by affidavits that he is a "pre-emptor or settler" on the land, or that the land "has no improvements on it, and that no person is residing upon it or claims it by virtue of any pre-emption certificate issued by authority of law." The land was not "selected and unconfirmed" swamp land; the plaintiffs were not pre-emptors or settlers upon it; and other persons were in the actual possession of the land, claiming it, and had made extensive and valuable improvements upon it. The laws and regulations of the land department of the state require that the existence of the facts essential to authorize the commissioner to sell swamp lands under the act of 1879 shall be made to appear by affidavits. No such affidavits were made or filed. The only affidavits filed were to the effect that the land was swamp land. Two other papers were filed: one an application to purchase the land under the act of March 18, 1879, not signed by the plaintiffs, but by persons styling themselves "agents," etc., and not sworn to by any one, and stating no facts. The other paper is not sworn to by any one, is not signed by the plaintiffs, but by their attorneys, and states that the plaintiffs purchased an improvement on the land, and went into possession of it in September, 1873; but it fails to state how long the possession continued, or that they were in possession at the date of the purchase. On the trial, as before stated, one of the plaintiffs testified that their possession terminated in the spring of 1874. Proof, in the mode required by law, of the fact or facts es-

sential to enable an applicant to enter swamp land is a condition precedent to the power of the commissioner to sell. No such proof was made or attempted. If such proof had been made, however informal or false in fact, the commissioner would have had jurisdiction to act in the premises. It is not a case of defective forms, or disputed facts; but one of a total absence of substance. There was no proof offered in any form or shape that the facts then existed that would authorize the commissioner to sell the land under either of said acts. The facts precluded any such proof, and there was no attempt to make it. In *Rice* v. *Harrell*, 24 Ark. 409, the court say:

"The land-agent permitted Harrell to enter the land in controversy by preemption, without the declaration and affidavits required by law, that he had an improvement thereon, etc. The sale so made was unauthorized by law. The statute provides: 'That the land-agents shall have full power and authority to sell any of the swamp and overflowed lands; but in making such sales shall be governed by the rules, provisions, and regulations now in force, and hereafter provided, or which may exist by law at the time of such sale.' Act January 12, 1853, § 7; Act December 30, 1856, § 2. The making and filing of the proper declaration and affidavits in the office of the land-agent, within the time limited, were legal prerequisites to a valid sale of the land by preemption. Without them the land-agent had no legal power to make such sale. As remarked by this court in *Cheatham* v. *Phillips*, 23 Ark. 87, the swamp lands belonged to the state. The title to them is not in the land-agent. They derive their power to sell them from the statutes, and have to follow their requirements in order to make valid sales."

On the uncontradicted facts in the case the commissioner had no power to execute the deed, and it would seem this may be shown in an action at law. *Doolan* v. *Carr*, 125 U. S. 618, 8 Sup. Ct. Rep. 1228, and cases cited. Notwithstanding the recital in the deed to the contrary, the land was never selected, designated, or certified as swamp land by any officer or agent of the United States or the state. This is conceded by the plaintiffs, who ask that the recital in the deed to the contrary may be rejected. When this is done, the plaintiffs' title rests on a quitclaim deed from the commissioner for whatever right or title, if any, the state acquired to the land under the swamp-land grant. Whether the state acquired any right to the land under that grant is left for future determination. As between such a deed and a patent previously issued by the United States, the patent must prevail. There is no presumption that all the public lands that belonged to the United States on the 28th of September, 1850, were swamp and overflowed lands. In the absence of proof, the contrary presumption must obtain. The grant to the state was of the swamp and overflowed lands. They had to be identified. To perfect the title of the state, or one claiming under her, to land as swamp land, it must be shown to have been such at the date of the grant, in some of the modes prescribed by law and the regulations of the land department, or, in cases where it is admissible, by parol evidence on the trial. *Railroad Co.* v. *Smith*, 9 Wall. 95; *Buena Vista Co.* v. *Railroad Co.*, 112 U. S. 165, 5 Sup. Ct. Rep. 84; *Wright* v. *Roseberry*, 121 U. S. 488, 7 Sup. Ct. Rep. 985; *Doolan* v. *Carr*, 125 U. S. 618, 8 Sup. Ct. Rep. 1228.

Waiving consideration of the question of the competency of parol proof of the quality of the land, in this case, its sufficiency will be considered. On this issue, as presented in this case, the burden of proof is on plaintiffs. To find this issue in the plaintiffs' favor the court must be "clearly satisfied by full proof of the disputed fact that the lands in controversy were swamp and overflowed lands at the date of the act of congress of September 28, 1850." *Buena Vista Co.* v. *Railroad Co.*, 112 U. S. 176, 5 Sup. Ct. Rep. 90. "Donations of the public domain for any purpose are never to be presumed. Those who claim against the government under legislative grants must show clear title." *Rice* v. *Railroad Co.*, 110 U. S. 698, 4 Sup. Ct. Rep. 178. It is an issue not to be determined in the affirmative upon doubtful and disputed testimony. On this issue the plaintiffs introduced five and the defendants three witnesses. It would serve no useful purpose to set out their testimony. The plaintiffs' witnesses give it as their opinion that the greater portion of the 40 acres was swamp and overflowed land, and the defendants' witnesses, with equal means of knowledge, are of the contrary opinion. In 1850 that country was sparsely settled, and most of the lands were in their natural state. There was no special landmark on this tract to attract attention to it, or distinguish it from the vast domain of wild lands surrounding it. None of the witnesses resided on or near the land, or had any interest in it. Not one of them knew where the lines or corners were until 1883, when they were pointed out to them by the plaintiffs, preparatory to their becoming witnesses in this case. Their attention was never called to this tract, any more than to any other 40-acre tract of wild land in that region. Their knowledge of it was acquired chiefly, if not solely, by occasionally traveling along a country road which ran on or near its western boundary. From such imperfect *data* they express the opinion, 35 years afterwards, that not more than 10 or 12 acres of the 40 was then dry land, and that the balance was swampy and overflowed. The integrity and veracity of the witnesses is not questioned, but they never possessed sufficient, accurate, and exact knowledge of this land to enable them to testify persuasively on this subject. They had no interest in the land, did not know its boundaries, and never went upon it and examined it with a view of determining how much of it was swamp and how much dry land, until more than a third of a century after the grant. Whatever knowledge they had of the condition of the land in 1850 was acquired in the most casual and perfunctory way. It may be said in this case, as was said by the supreme court of the United States in an analogous case:

"Those who could testify from actual knowledge are perhaps all dead. The population of that time has all passed away, and the memories of any who may be living must be very imperfect."

The rule adopted by the courts as to the character of the evidence necessary to maintain the affirmative of this issue is the same as that adopted and acted upon by the commissioner of the general land-office from the date of the grant. In his instructions to the surveyor general of Arkansas, dated December 21, 1853, and April 8, 1854, the com-

missioner says "that the witnesses must testify that they have examined the lines and corners of the lands in relation to which they testify," and "that they have examined the surface of the land and the marks or designations on the corner-posts and trees, and that from such examination they have ascertained and know that the greater part of each forty-acre lot of the body of land in relation to which they testify is wet and unfit for cultivation." In a letter of instructions, dated June 5, 1860, addressed to the register and receiver at Little Rock, he says:

"Testimony now, after the lapse of nine years, to be available, must be explicit, resting upon personal and exact knowledge of the locations claimed, and must relate to each quarter quarter section, or other equivalent legal subdivision."

The following is a part of the preamble to an act of the legislature approved March 17, 1885:

"Whereas, more than thirty-four years have now elapsed since such date, (28th September, 1850,) and but few persons are now alive who can testify to the character of such land as it appeared on the 28th day of September, 1850."

This is a legislative recognition of the difficulty of finding living witnesses to testify intelligently on this subject. The testimony must relate to the condition of the land at the date of the grant. "From divers natural and artificial causes the surface of the earth is continually changing, and lands which were wet, overflowed, and unfit for cultivation in 1850 may now be high and arable; and so *vice versa.*" *Hendry* v. *Willis*, 33 Ark. 837. The most satisfactory evidence in relation to the quality of the land remains to be noticed. The statutes of the United States provide that "every surveyor shall note in his field-book * * * all water-courses over which the line he runs may pass; and also the quality of the land." Rev. St. U. S. § 2395, subd. 7. The field-notes of the survey of this land are in evidence. The survey was made in April, 1841,—a season of the year when, if the land was wet and swampy, that fact would be apparent,—but the field-notes do not show it to be other than dry land at that time. The clear implication from the field-notes is that it was arable land. The value of the field-notes as evidence was settled by the supreme court of the United States in the case of *U. S.* v. *Low*, 16 Pet. 166, where the court say:

"The official return of the surveyor general has accorded to it the force of a deposition. So we held in the case of *U. S.* v. *Breward*, 16 Pet. 147, and *U. S.* v. *Hanson*, Id. 196, to which we refer."

They rank as the deposition of a surveyor, charged under oath with the duty of noting on the spot, and at the time he makes the survey, the quality of the land. Soon after the passage of the act making the grant the commissioner of the general land-office advised the surveyor general of the state that, "in all cases where the plats and field-notes represent the lands as swampy, or subject to such overflow as to render them unfit for cultivation, they belong to the state under the law, and will be so certified." And by several acts of the general assembly of this state (Acts 1885, p. 71; Acts 1887, p. 102; Acts 1889, p. 67) the state agrees in the adjustment of her swamp-land claims against the United States "to

accept as final and conclusive in determining the character of such lands the original field-notes of the official survey," where they show conclusively the character of the land. Additional proof that the land was not swamp land is found in the fact that it was never selected as such by the state agents. In the preamble to an act approved March 17, 1885, it is recited that "by section 15 of 'An act for the reclaiming of swamp and overflowed lands donated to the state by the United States,' approved January 6, 1851, the state elected to .select such lands by placing locating agents in the field, whose duty it was to survey and examine such lands and report their action to the governor of the state, who furnished the lists describing such selections to the United States authorities." The fifteenth section of the act referred to in this preamble required the board of swamp-land commissioners to "proceed immediately to ascertain the swamp and overflowed land granted to the state by the act of congress," and empowered them to appoint one person in each county to aid them in the work. By an act approved 30th of December, 1856, the board of swamp-land commissioners was abolished, but the act made provision for completing the selection of swamp lands. The fifth section of the act provided that "there shall be appointed by the governor one selecting agent in each county in this state where there may be any unselected swamp and overflowed land, whose duty it shall be to select all the unreported lands lying within his county, and falling within the terms of the act of congress." These agents were appointed, and furnished with the requisite instructions and blanks. In his report to the governor, dated October 1, 1858, the swamp-land secretary for the state says:

"Under the fifth section of the swamp-land act, approved December, 1856, one selecting agent for each county in the state was appointed by your excellency to select all the unreported swamp lands inuring to the state under the act of congress, * * * and there are now regularly appointed agents for the purpose above indicated in every county * * *" in which there are swamp lands.

In the same report the secretary says:

"The work of selecting the remainder of the swamp and overflowed lands is still progressing in some of the counties, and the agents have been instructed to prosecute it as speedily as possible, until every acre in their respective counties shall have been selected and reported."

The same officer, in his report to the governor, dated October 1, 1860, states that the selections had been made, and "the lists returned," by the selecting agents for certain counties, and among them Lafayette, the county in which the land in controversy then lay. It is not shown that the state has selected or made any claim to any other lands in that county under the swamp-land grant since that time. The agent who made the selections resided in the county, and was charged with the duty of selecting all the swamp lands in it. His official duty, as well as the fees he received for his services, would impel him to include in his selections all lands coming within the purview of the grant, and it is highly probable that he did so. It is a maxim of the law that a public officer

is presumed to have fulfilled every requisite which the discharge of his duty demands, (*Russell* v. *Beebe*, Hemp. 704,) and this maxim is applicable to the state agent, and it will be presumed that he selected and reported all the swamp lands in the county in accordance with his official duty; and after the lapse of 30 years, and on the facts of this case, this presumption would seem to be conclusive.  *U. S.* v. *Beebe*, 127 U. S. 338, 8 Sup. Ct. Rep. 1083; 9 Ops. Atty. Gen. 204.  But if it were swamp land it would avail the plaintiffs nothing; because, as has been shown, if it was swamp land, the state's title to it was vested in the purchaser from the United States by the acts of 1851 and 1875.  The only parties, on the facts of this case, whose interests can possibly be affected by the determination of this issue are the state and the United States. If it was swamp land, the United States would be under obligation to pay to the state the purchase money it received from the railroad company for the land.  It would have no other effect.

In the preparation of this opinion the court has consulted some public documents, embracing official reports and correspondence of public officers of the state and the United States, relating to the swamp lands of the state, and published by authority, that were not formally introduced in evidence.  This practice has the sanction of the supreme court of the United States.  *U. S.* v. *Teschmaker*, 22 How. 405; *Romero* v. *U. S.*, 1 Wall. 742; *Watkins* v. *Holman*, 16 Pet. 56; *Bryan* v. *Forsyth*, 19 How. 338; *Gregg* v. *Forsyth*, 24 How. 179.  The conclusions reached on other points in the case make it unnecessary to consider the effect on the plaintiff's deed of the act of congress of March 12, 1860, (12 St. 3,) which required that all selections of swamp lands to be made thereafter from lands already surveyed should be made within two years from the adjournment of the legislature of the state at its next session after the date of the act.  In reference to this act see:  Letter of the commissioner of the general land-office to the register and receiver at Little Rock, June 5, 1860; report of swamp-land secretary of Arkansas, October 1, 1860; report of commissioner of state lands, October 15, 1878; *Buena Vista Co.* v. *Railroad Co.*, 112 U. S. 174, 5 Sup. Ct. Rep. 84; *Wright* v. *Roseberry*, 121 U. S. 511, 7 Sup. Ct. Rep. 985.